# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STACY MCDANIEL-WESCHE, | : | |
| Claimant Below-Appellant, | : | C. A. No. S23A-03-002 CAK |
| v. | : | |
| SUN BEHAVIORAL HEALTH, | : | |
| Employer Below-Appellee. | : | |

Submitted: February 15, 2024

Decided: March 6, 2024

*On Appeal from Industrial Accident Board*

**AFFIRMED**

**MEMORANDUM OPINION AND ORDER**

Jonathan B. O'Neill, Esquire, Kimmel, Carter, Roman, Peltz & O'Neill, P.A., 56 West Main Street, Suite 400, Plaza 273, Christiana, DE 19702, Attorney for Claimant/Appellant.

Nicholas E. Bittner, Esquire, Heckler & Frabizzio, 800 Delaware Avenue, Wilmington, DE 19899-0128, Attorney for Employer/Appellee.

**KARSNITZ, R.J.**

# PROCEDURAL BACKGROUND

On August 23, 2022, Stacy McDaniel-Wesche ( "Claimant") filed a Petition to Determine Additional Compensation Due (the "Petition") with the Delaware Industrial Accident Board (the "Board"), seeking payment of medical expenses and permanent impairment to the neck and right upper extremity resulting from a work accident.

On February 7, 2023, the Board held a hearing. Claimant testified on her own behalf, while also submitting deposition transcripts of Dr. Ganesh Balu and Dr. Jonathan Kates. Sun Behavioral Health, Inc. ("Employer") submitted a deposition transcript of Dr. Lawrence Piccioni. The Board issued its decision on February 14, 2023, finding Claimant sustained a soft tissue injury to the neck, with treatment through November 9, 2021 being compensable. Benefits for the treatment of any other body parts were denied.

On March 9, 2023, Claimant filed a notice of appeal of the Board's decision to this Court, challenging the Board's decision as to the denial of benefits. Claimant filed her Opening Brief on October 9, 2023. Employer filed its Answering Brief on October 26, 2023. Claimant filed her Reply Brief on November 13, 2023. I held oral argument on February 15, 2024. This is my decision.

## FACTS

On December 13, 2020, Claimant, a registered nurse, was involved in an

incident at work where she intervened in an assault and was grabbed and struck by a patient. Claimant initially felt pain in her neck, and over the following week noticed pain in other body parts. Claimant subsequently saw video footage of the incident, but that video has since been recorded over in the normal course of business.

Following the incident, Claimant went to the emergency room, where she declined X-rays. Indeed, Claimant did not want to seek treatment at all, but her husband insisted. The records identify only abrasions and the only body parts treated were the face and neck.

Before the work incident, Claimant had treated with a chiropractor for upkeep on various other body parts.

After the work incident, Claimant was involved in a motor vehicle accident on January 18, 2021. She initially did not recall whether she sought treatment for that accident, although later she testified that she did not seek treatment.

Claimant began treatment with Dr. Balu on February 9, 2021. Dr. Balu's records do not show evidence of radiculopathy. Dr. Balu performed an injection into the AC joint and the biceps tendon, even though the biceps tendon was shown to be normal on the MRI. Although Dr. Balu gave a diagnosis of partial rotator cuff tear and impingement, he never administered an injection into the rotator cuff. Because the shoulder is compartmentalized, the other injections would not have reached the subacromial space or the rotator cuff. The injections did not provide significant

3

relief. At a visit with Dr. Balu on July 20, 2021, Claimant was instructed to return in four weeks, but she did not.

Instead, Claimant treated with a chiropractor for fifteen visits over a three-month period. When she stopped treating with the chiropractor in October 2021, she was doing fairly well.

Claimant returned to Dr. Balu on February 9, 2022, at which time her physical examination findings were essentially the same as they had been at the July 2021 visit. However, despite Claimant identifying right shoulder complaints, Dr. Balu did not perform a right shoulder examination. By November 9, 2022, Claimant's pain scores were higher than they had previously been.

Claimant saw Dr. Kates on February 2, 2022 for the purpose of evaluating permanent impairment, and not for treatment. Claimant's intervening motor vehicle accident was not identified in Dr. Kates' report, and Claimant never told Dr. Kates about it. Dr. Kates did not have any records since July 2021, nor did he have the EMG report. The physical examination findings were not consistent with a partial rotator cuff tear. There was no atrophy noted, notwithstanding the significant time elapsed since the work incident. Dr. Kates found no permanent impairment to the lower back or right hip. He did find 11% permanent impairment to the neck, as well as 11% permanent impairment to the right shoulder. His opinions were based on Claimant's history and subjective complaints and were subject to change if those

4

were not accurate. Claimant saw Dr. Kates again on October 24, 2022, at which time he still had not seen updated medical records or the EMG. He did not provide her with a full physical examination at that time.

Claimant visited Dr. Piccioni on November 9, 2021, after she had discontinued chiropractic care and during the gap between visits with Dr. Balu. There were no objective signs on physical examination. Her subjective symptoms did not match prior EMG or MRI findings to support radiculopathy. At a second examination with Dr. Piccioni on June 10, 2022, Claimant informed Dr. Piccioni that she had returned to Dr. Balu. On examination, there were still no objective findings.

### THE BOARD HEARING

The Board conducted a hearing on February 7, 2023. Claimant acknowledged she did not identify her pre-accident treatment with a chiropractor. She acknowledged prior low back and ACL issues. She did not identify the intervening motor vehicle accident. Claimant testified that she told Dr. Balu about the accident. However, Dr. Balu testified that she did not tell him about the accident, and that he did not document the motor vehicle accident and, if Claimant had reported it, he would have documented it.

Claimant acknowledged she did not voluntarily seek out treatment, and did not stop working because of a doctor's note. Claimant acknowledged her first appointment with Dr. Balu was almost two months after the work incident, and she

only went when she felt it was necessary to do so, and that it had not been necessary previously. As of the hearing date, she had not seen an orthopedic surgeon.

Dr. Piccioni testified on behalf of Employer, explaining the first 48-72 hours after an injury are the most painful, yet Claimant went back to work, did not receive much care, and had no initial diagnostic studies. He confirmed that the important diagnostic studies were performed after the intervening accident; therefore, it is impossible to distinguish what was caused by the work accident and what was caused by the car accident. Both Dr. Piccioni and Dr. Kates agreed the MRI findings for Claimant predated the work accident, and the work accident did not cause any structural changes. Dr. Balu was the only physician to document spasm, which was the only objective finding.

Dr. Piccioni also discussed his concerns with Dr. Balu's performing all medical services in-house, generating a bill of almost $63,000 in less than two years (including a large gap in treatment), without any referral to an orthopedic specialist. He questioned Dr. Balu's findings and Claimant's lack of improvement from treatment. Dr. Piccioni also questioned the lack of a medical basis for administering platelet-rich plasma ("PRP") injections to Claimant.

Dr. Piccioni testified the work-related injury to the neck was a sprain, superimposed on chronic degenerative changes, with no evidence of radiculopathy. It is reasonable and appropriate to conclude the neck injury resolved during the gap

in treatment in 2021, after she discontinued chiropractic care and before she returned to Dr. Balu. Dr. Piccioni did not attribute any right shoulder injury to the work incident, citing no early complaints or diagnoses, non-acute MRI findings, inconsistencies between examination findings and diagnoses, and the lack of an injection to the diagnosed rotator cuff. He also did not attribute any low back or right hip injuries to the work incident.

According to Dr. Piccioni, treatment up through October 2021 was reasonable and necessary, and treatment thereafter was unreasonable regardless of causation. Dr. Piccioni opined that his examination date of November 9, 2021 was a fair cutoff date for reasonable and necessary treatment. He also believed that the PRP injections and the right shoulder treatment were neither reasonable nor necessary. Based solely on Claimant's subjective complaints, Dr. Piccioni found a 3% permanent impairment to the neck; and if those subjective complaints are not believed, 0%. Of the 3% rating, it is not possible to distinguish whether it was caused by the work accident versus the intervening motor vehicle accident.

There was discussion at the hearing about the video of the incident, suggesting that the video may have helped prove causation as to certain areas of the body. Claimant's attorney asked the Board to draw an adverse inference from the absence of the video. Employer's attorney argued in response that the adverse inference issue should have been raised as a pre-hearing matter.

Following a comprehensive review of the evidence, the Board found the neck injury and treatment through November 9, 2021 to be compensable. The Board specifically found Dr. Piccioni's testimony to be persuasive, while Claimant and Dr. Balu gave inconsistent and insufficient testimony to support any further benefits. Claimant did not disclose information about the intervening car accident either to her own medical experts or to the Board, which impacted her credibility. Claimant was also inconsistent by testifying she could no longer work as a bedside nurse or engage in activities of daily living, and yet she waited almost two months to seek further medical treatment, while never pursuing orthopedic treatment. Claimant only stopped working and sought treatment after the intervening car accident. Even once treatment started, Claimant again had a lengthy gap in treatment, which undermined her alleged ongoing symptoms.

The Board was persuaded by Dr. Piccioni's comprehensive review of the records, which supported the exclusion of all injuries but the neck. The Board accepted his testimony on the imaging and EMG studies, noting they could be related to either the work accident or the motor vehicle accident, with no way to distinguish between them, aside from noting the actual MRI findings predated both accidents. This was buttressed by the gap in treatment, which ended with Claimant discontinuing chiropractic treatment because she was doing well, supporting the lack of need for further treatment. The Board spent multiple paragraphs

summarizing Dr. Piccioni's relevant testimony, noting they found his conclusions convincing.

The Board accepted treatment through November 9, 2021, excluding any PRP injections, with the neck injury resolving at that point. The Board found insufficient evidence to find right shoulder, hip, or back injuries related to the work accident. Given the finding of resolution of the neck and denial of the other body parts, the Board accepted Dr. Piccioni's testimony that there was no permanent impairment attributable to the work accident.

## STANDARD OF REVIEW

The appeal before me is on the record of the proceedings before the Board.[1] My review is limited. I review the decision of the Board solely to determine whether there is substantial competent evidence in the record to support the Board's findings and whether its decision is free from legal error.[2]

I do not determine questions of credibility, or make my own factual findings.[3] I view the facts in the light most favorable to the Board.[4] A ruling of the Board will not be disturbed on appeal unless it is based clearly on unreasonable or capricious grounds. The "Court gives significant weight to the [Board] regarding its application

---

[1] 29 *Del. C.* §10142.
[2] *Johnson v. Chrysler Corp.,* 213 A.2d 64, 66 (Del. 1965); *General Motors Corp. v. Freeman,*164 A.2d 686, 688 (Del. 1960); *General Motors Corp. v. Jarrell,* 493 A.2d 978, 980 (Del. Super 1985).
[3] *Id.*
[4] *Chudnofsky v. Edwards,* 208 A.2d 516,518 (Del. 1965).

of legal principles in the specialized context of our state's workers' compensation scheme, because the [Board] has the occasion to give life to that scheme on a weekly basis in the many cases that come before it."[5]

## ANALYSIS

There are two issues on appeal: (1) whether the Board's decision limiting the compensable injury to Claimant's neck through November 9, 2021 is supported by substantial evidence and free of legal error; and (2) whether the Board acted properly in not applying an adverse inference from the absence of a video of the work accident (spoliation).

### Substantial Evidence Free from Legal Error

Claimant argues that the Board's acceptance of Dr. Piccioni's medical expert opinion that Claimant had a 0% - 3% impairment to the neck, and no injury to the low back or right hip, attributable to the work accident is legally flawed. However, "[t]he Board is free to accept or reject in whole or in part testimony offered before it and to fix its verdict upon testimony accepted."[6] The Board is free to accept one expert's opinion over another and may accept or reject an expert's testimony entirely.[7] The Board acted within its legal authority when accepting the expert

---

[5] *Berry v. MIRTA QSR KNE LLC,* 2021 WL 626944 (Del. Super. Feb. 16, 2021) citing *Christiana Care Health Services v. Davis,* 127 A.3d 391, 395 (Del. 2015).

[6] *Collins v. Giant Food, Inc.,* 1999 WL 1442024, at *3 (Del. Super. Oct. 13, 1999).

[7] *Torres v. Reybold Homes, Inc.,* 1999 WL 144024 (Del. Super. Apr. 24, 2014).

10

testimony of Dr. Piccioni over that of Dr. Balu. The Board's acceptance of expert testimony, even when contradicted by other expert testimony, qualifies as substantial evidence for purposes of appeal.[8] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[9] In my opinion, the Board's decision to accept Dr. Piccioni's medical expert opinion as to the extent of Claimant's injuries from the work accident was supported by substantial evidence and within the Board's purview as trier of fact.

Beyond the Board's broad discretion in choice of medical experts, it also enjoys discretion in its findings of credibility. "Often, as in this case, this factual finding depends in large measure on the Board's assessment of the credibility of the witnesses who testify before it. It is the exclusive function of the Board to evaluate the credibility of witnesses."[10] Our Supreme Court has upheld the Board's prerogative to find a delay in seeking treatment to harm the claimant's credibility.[11]

Claimant argues the lack of diagnostic testing after the work accident simply means that she preferred to go back to work. Claimant also failed to seek diagnostic testing after her work shift ended. In my view, however, this undercuts her claim of significant injury. Claimant continued to work her regular job as a nurse until she

---

[8]*DiSabatino Bros. Inc. v. Wortman,* 453 A.2d 102, 106 (Del. 1988).
[9]*Histed v. E.J DuPont de Nemours & Co.,* 621 A2.d 340, 342 (Del. 1993).
[10]*Powell v. OTAC, Inc.*, 223 A.3d 864, 871 (Del. 2019).
[11] *Id.*, at 872.

voluntarily quit. She was never given work restrictions prior to quitting. Claimant went to her primary care physician, who did refer her to an orthopedic specialist or to obtain CT or MRI studies of any body part, and only obtained X-rays of the neck. Nothing else was apparently significant enough to concern the physician. Indeed, she did not obtain anything more than a cervical X-ray after the intervening vehicle accident. The Board accepted her cervical injury, after her eventual pursuit of a cervical X-ray and treatment for her neck. However, even on a subsequent visit to her primary care physician, she did not complain about her right shoulder or low back. Moreover, did not even allege low back and right hip injuries as part of her Petition. The Board refused to accept Claimant's claims, as is their prerogative.

Claimant states that the Board claimed the emergency room records do not document right shoulder, low back, or right hip pain, and then counters that Dr. Piccioni identified right hip and low back complaints. However, Dr. Piccioni was referring to her primary care physician's records, not the emergency room records.

Claimant must prove that she suffered an injury sustained during an accident related to her employment.[12] Identifying a symptom does not constitute proving an injury. There was essentially no treatment for the right hip and lower back, and by the time of Dr. Piccioni's first examination, Claimant no longer had complaints to

---

[12] *Lewicki v. New Castle County*, 913 A.2d 570, 2006 WL 3307436, at *2 (Del. Super. Nov. 15, 2006) (Table).

either body part. Dr. Balu provided no meaningful explanation as to why he would relate the low back and right hip to the work accident, nor did he address the lack of such complaints documented in the emergency room records.

Claimant did not provide the name of her chiropractor. Thus, no physician was able to review her pre-accident chiropractic records, although Claimant acknowledged receiving chiropractic adjustments before the accident. This could be evidence of a preexisting low back and right hip condition. However, because Claimant was not forthcoming with the chiropractic records, neither her physicians nor Employer's physician could review them to determine if her subsequent symptoms and complaints preexisted the work accident, This affects decision making as to the issue of causation.

With respect to the gaps in treatment, Claimant disputed not seeking additional treatment for two months after the work accident, and stated she treated consistently with Dr. Balu except for a three-month gap. While Claimant did go to her primary care physician three weeks after the work accident, there was no specialist treatment until two months later, and no orthopedic treatment at all. Claimant's gap in treatment with Dr. Balu stretched from July 2021 to February 2022 -- a span of seven months. Claimant discontinued treatment with Dr. Balu, having only a handful of chiropractic sessions resulting in reported improvement in symptoms, and then a gap with no treatment at all until it was time to be rated for

permanent injury by Dr. Piccioni. Only then did Claimant return to Dr. Balu. All these events point to minor medical problems and damaged Claimant's credibility.

Of course, the initial delay is also complicated by the intervening vehicle accident. Claimant minimizes this because she testified that she had no injuries and sought no treatment related to that accident. Before the vehicle accident, there was no indication the work accident aggravated any preexisting conditions, and all her symptoms were consistent with a neck strain/sprain. The vehicle accident could cause new injuries aggravating her preexisting conditions. It is impossible to state to a reasonable degree of medical probability that the vehicle accident had no impact on Claimant's physical condition. Dr. Piccioni testified about the complication the intervening vehicle accident raises in assessing causation and the extent of injuries related to the work accident, and the Board accepted his testimony. In a similar case, where Dr. Picconi also testified, an MRI finding giving rise to surgery was only visualized after intervening incidents, which could have caused additional injury to the claimant's lumbar spine. The Board accepted the doctor's testimony and found that claimant failed to meet the burden of proof, and this Court affirmed: "By accepting Dr. Piccioni's opinion, the Board made a permissible credibility determination in order to reconcile competing medical theories of causation."[13]

With respect to the intervening vehicle accident, Claimant is an intelligent and

---

[13] *Hamilton v. Independent Disposal Service,* 2017 WL 631770 (Del. Super. Feb. 15, 2017).

educated medical professional, and she knows or should know that vehicle accidents are considered significant events, which should be disclosed to medical providers. In fact, her testimony of telling Dr. Balu about the accident demonstrates its relevance.

The evidence about the intervening vehicle accident and treatment therefor is conflicting and contradictory. Dr. Piccioni testified that Claimant could not recall whether she received treatment following the vehicle accident. Claimant's attorney testified there was an emergency room visit after the vehicle accident. Claimant testified there was no medical treatment following the accident. Claimant also testified she told Dr. Balu about the accident, but Dr. Balu denied this. indicated she did not, or he would have documented it. The Board was well within its rights to find this harmful to Claimant's credibility.

Next, Claimant argues that the Board rejected the necessity of PRP injections without explanation. However, the Board reviewed Dr. Piccioni's reasoning for rejecting them and explicitly agreed with such reasoning. Whether the Board has previously awarded PRP injections in other cases is irrelevant. The prior Board decision cited by Claimant involved injections to the left ankle. Dr. Piccioni discussed the anatomy where PRP injections could be considered, noting none of that applied in this case. Further, it appears from the record the first PRP injection was performed on February 21, 2022, which is after the cutoff date due to resolution, and thus it is irrelevant whether the Board specifically considered it,

because the Board found all treatment after the cutoff to be non-compensable due to resolution.

Next, Claimant argues that the Board placed too much weight on Dr. Piccioni's testimony on the degree of permanency of the neck injury from the work accident. With respect to her right shoulder, Claimant stresses Dr. Piccioni's statement that there was an impact to Claimant's right side by a chair during the work accident. As stated above, however, contact of a body part may constitute an accident, but it does not automatically mean that there is an injury.

Claimant suggests Dr. Piccioni's testimony is speculative, and yet her own medical experts do not address causation or the interplay with the intervening vehicle accident. Dr. Kates stated that all MRI findings predate the work accident, and show no acute, traumatic rotator cuff injury. His entire explanation for causation of the right shoulder was because Claimant was asymptomatic before the work accident. However, according to the emergency room and primary care physician records, Claimant's right shoulder was also asymptomatic after the work accident. The only complaints arose after the intervening vehicle accident. which, as discussed previously, is fatal to establishing causation linked to her employment. Even the diagnosis of a rotator cuff tear is questionable, as Dr. Balu never treated the rotator cuff; he injected areas of the shoulder completely unrelated to the rotator cuff.

Claimant has also failed to carry her burden of proof on the issue of

16

permanency of the injury. Claimant must prove the loss of a body part or a loss of use of a body part resulting from the work accident.[14] Evidence showing a lack of work-related symptoms goes to the core of the loss of use standard, even if the Board does not plainly state that it is addressing loss of use.[15] "Without some physical manifestation of the injury, the Board correctly assert[s] that the Claimant suffered no loss of use."[16] If there are no medical findings attributable to a work injury, then there cannot be a loss of use, as loss of use must be demonstrable through the manifestations of the injury.[17]

The only physician to document objective findings in the neck (spasm) was Dr. Balu. The two physicians who assessed permanent impairment did not find any spasm or other objective findings. As explained by Dr. Piccioni, objective findings in this situation would include atrophy, loss of reflex, paralysis, spasm, swelling, bruising, and lacerations; none of those were found by Dr. Kates or Dr. Piccioni. Because the Board did not find Claimant to be credible, it was entitled to discount her subjective complaints. The lack of objective medical findings means that there is no loss of use, and no loss of use means that there is no permanent impairment. Even if the Board had accepted Claimant's subjective complaints, it was her burden to

---

[14] *Miller v. Delaware Psychiatric Ctr.*, 2013 WL 1281850, at *11 (Del. Super. Mar. 28, 2013).
[15] *See Cruz v. Ryder Public Transp.*, 2003 WL 1563719, at *6 (Del. Super. Mar. 20, 2003).
[16] *Young v. Food Lion, Inc.*, 2002 WL 499890, at *2 (Del. Super. Jan. 28, 2002).
[17] *Id.*

prove they related to the work accident, and she failed to do so.

Claimant suggests the finding of a soft tissue injury to the neck is inconsistent with the MRI imaging showing herniated discs. This ignores Dr. Kates' own acknowledgment that such MRI findings predated the work accident. Dr. Picconi agreed with Dr. Kates' statement on the MRI findings predating the accident. Claimant's argument is contradictory: the herniated discs are proof of more than a soft tissue injury resulting from the work accident, but her own expert testified that the herniations predated the work accident. In any event, the Board's specifically found that the MRI studies showed no acute findings. Even if the studies did show acute findings, they occurred after the intervening vehicle accident.

The controlling point is that the Board's decision was supported by substantial competent evidence.

**Spoliation**

Claimant argues that the Board should have drawn an adverse inference from the spoliation of the video of the work accident. I have three reasons for rejecting this argument.

First, Claimant never directly asked for an adverse inference finding at the Board hearing. During closing arguments, counsel for Claimant discussed the video and said that there should be an adverse inference with respect to the video. Counsel did not ask for a ruling on an adverse inference; he simply asked the Board to act

as if there were an adverse inference. But "[a]dministrative cases cannot be 'reversed and remanded' on appeal based on a change in strategy and evidence that parties chose not to present to the administrative board."[18] "[W]hen the Court acts in its appellate capacity on an appeal from an administrative agency, it is limited to the record, and will not consider issues not raised before that agency."[19]

Second, Claimant did not follow the Delaware process for obtaining an adverse inference. There must be a preliminary finding of intentional or reckless destruction of evidence,[20] but Claimant never requested such a finding by the Board. Even if Claimant had followed the appropriate procedure, there is no evidence on the record of intentional or reckless conduct. Claimant's testimony was that the video was not saved and had been recorded over, not deleted. No other evidence was presented about the video. Claimant never requested that a copy of the video be saved. The claim itself had been accepted, and there was no dispute that the incident had occurred. The complaints about the right shoulder began two months later, so there was no reason at the time Claimant saw the video to believe that there would be a dispute as to which body parts were injured in the work accident.

---

[18] *Gatewood v. Salga Products, Inc.*, 1996 WL 944878, at *5 (Del. Super. Aug. 5, 1996).
[19] *Potts Welding & Boiler Repair Co., Inc. v. Zakrewski*, 2002 WL 144273, at *4 (Del. Super. Jan. 11, 2002).
[20] *Sears, Roebuck and Co. v. Midcap*, 893 A.2d 542, 550 (Del. 2006).

Third, there is no reason to believe an adverse inference would have changed the outcome. The Board's decision focused heavily on gaps and delays in treatment and complaints, coupled with the issue of the intervening accident. Claimant testified as to precisely what the video allegedly showed, and the Board was free to accept or reject her testimony. Even if the video corroborated Claimant's testimony, she failed to identify any right shoulder complaints for two months after the work accident. That delay in onset -- a critical issue for the Board -- had nothing to do with the video.

## CONCLUSION

For the foregoing reasons, Claimant's appeal is denied, and the decision of the Board is **AFFIRMED**.

**IT IS SO ORDERED.**

/s/ Craig A. Karsnitz
Craig A. Karsnitz

cc:    Prothonotary

20